## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**FUNDING ADVISORS CLAIMS RECOVERY, LLC, et al.,**

       **Plaintiffs/Counterclaim-Defendants,**     :

**v.**

       **Case No. 2:21-cv-1501**
       **Judge Sarah D. Morrison**
       **Magistrate Judge Kimberly A. Jolson**

**ADVANCED CARE HOSPITALISTS PL.,**     :

       **Defendant/Counterclaim-Plaintiff.**

## <u>OPINION AND ORDER</u>

Before the Court are four motions: (1) Plaintiffs Funding Advisors Claims Recovery, LLC and Wellness Wishes, Inc.'s Motion for Partial Summary Judgment (ECF No. 57), (2) Advanced Care Hospitalists, PL's ("ACH") cross Motion for Partial Summary Judgment (ECF No. 82), and (3) ACH's Motion to Strike Declaration of Laura Dowling (ECF No. 89), and (4) ACH's unopposed Motion seeking leave to exceed the 10-page limit imposed by the Court's Standing Order (ECF No. 87).

Because the Court does not consider Dr. Laura Dowling's Declaration in reaching its decision on the dispositive motions, ACH's Motion to Strike (ECF No. 89) is **DENIED as MOOT**. ACH's Motion seeking to exceed the 10-page limit (ECF No. 87) is **GRANTED**. The other two pending motions are addressed below.

## I.      RELEVANT FACTS

When a healthcare provider submits its bill to a patient's insurance provider or other third-party payor (such as Medicare or Medicaid), the third-party payor might deny the insurance claim altogether or pay less than the pre-negotiated amount. (*See* Pl. Mot., Harper Dep. Vol. I, 29:1-30:3, ECF No. 57-8, PAGEID # 381.) If the payor pays less than the pre-negotiated amount, it results in an underpayment to the provider. (Def. Mot. Ex. E, ECF No. 82-6, PAGEID # 986-87.) Underpayments are lost revenue that a provider generally cannot recover because, in many cases, it does not have the systems or resources to collect the underpayments. (*See id.*)

This is where Funding Advisors comes in. It is an Ohio-based business that helps healthcare organizations such as hospitals, physician practices, and medical facilities recover revenue lost because of underpayments. (*See* Def. Mot. Ex. A, Morrow Dep. 31:7-32:8, ECF No. 82-1, PAGEID # 700.) It works with healthcare organizations to identify underpaid insurance claims. (*See id.*; *see generally*, Def. Mot. Ex. E.) After identifying potential underpayments, Funding Advisors appeals the underpayments to the third-party payor by contacting the payor to request payment for the underpaid claim and/or negotiating a payment amount. (*See* Def. Mot. Ex. A, Morrow Dep. 71:5-20, PAGEID # 710.) Funding Advisors retains a portion of any collected underpayments. (*See* Def. Mot. Ex. E, PAGEID # 986-87.)

Wellness Wishes, Inc., a nonprofit organization that provides medical care and carries out charitable work in the medical field, receives a percentage of the

fees that Funding Advisors generates to carry out its charitable mission. (Def. Mot.
Ex. A, Morrow Dep. 21:16-21, PAGEID # 697.)

### A. Plaintiffs and ACH Enter an Agreement for Underpayment Recovery Services.

ACH is a Florida-based physicians' practice group that provides hospitalist
care to patients. (First Am. Countercl. ¶ 13, ECF No. 8, PAGEID # 85.) In early
2020, ACH's CEO and President (Dr. Gulab Sher) and ACH's Chief Operating
Officer (Joseph Harper) were concerned about underpayments, so they discussed
with the Board members ways to rectify ACH's billing systems and collection
practices. (Pl. Mot. Ex., Harper Dep. Vol. I, 28:14-30:4, 46:23-47:23, ECF No. 57-8,
PAGEID # 380-81, 383.)

Not long after these discussions, Dr. Stephen Lee (a physician who helped
Plaintiffs with business development) contacted Mr. Harper on LinkedIn about
Plaintiffs' business. (Def. Mot. Ex. C, Lee Dep. 7:19-8:6; 16:4-19:9-20, ECF No. 82-3,
PAGEID # 914, 916; Def. Mot. Ex. D, Harper Dep. 129:15-13:16, ECF No. 82-5,
PAGEID # 965.) In a follow-up phone call, Dr. Lee told Mr. Harper that Plaintiffs
could help ACH identify and appeal underpayments; he also introduced Mr. Harper
to Erin Morrow, Plaintiffs' Director and President. (*Id.*) Dr. Lee then sent Mr.
Harper a promotional brochure that described Plaintiffs' businesses, charity work,
and the recovery and appeal process. (*Id.*)

On March 14, 2020, Mr. Harper emailed ACH's Board of Directors about
Plaintiffs' services and provided the Board members with excerpts of the brochure.
(Def. Mot. Ex. D, Harper Dep. 136:11-137:9, ECF No. 82-4, PAGEID # 965-67.) Ten

days later, Mr. Harper, on behalf of ACH, signed a Sales and Services Agreement

("Service Agreement") with Plaintiffs. (Pl. Mot. Ex. A, ECF No. 57-2, PAGEID #

347-56.)

The Service Agreement specifies that Plaintiffs would review ACH's records

for underpayments and appeal those underpayments to collect all or part of the

underpayments in exchange for 50% of any collected underpayment. (*Id.* §§ 1, 3.b.,

Schedule A, PAGEID # 347-348, 354-55.) It defined "underpayment" as:

> The difference between the amount paid and the amount that should
> have been paid.

(*Id.*)

Relevant to the pending Motions, the Service Agreement provides that ACH

would pay a specified fee if it prohibited Plaintiffs from pursuing the collections

process, stating:

> At the time CONSULTANT completes its analysis of the CLIENT
> DATA and determines the amount of possible UNDERPAYMENTS,
> CLIENT agrees to authorize CONSULTANT to move forward with the
> APPEAL PROCESS and RECOVERY. Should CLIENT decide not to
> allow CONSULTANT to move forward with seeking to recover
> UNDERPAYMENTS or prohibits CONSULTANTS ability to recovery
> UNDERPAYMENTS in any way, CLIENT agrees to pay
> CONSULTANT a FEE of 60% of the total UNDERPAYMENTS
> identified.

("60% fee provision"). (*Id.*, PAGEID # 355.) Both parties had the right to terminate

the Service Agreement at any time so long as the party provides a 90-day written

notice to the other party. (*Id.* § 10, PAGEID # 350.)

Plaintiffs and ACH also executed a Business Associate Agreement ("BA

Agreement"), which authorized Plaintiffs' disclosure of, and ACH's use of, protected

4

health information to perform under the Service Agreement. (Reply Ex. O, ECF No. 88, PAGEID # 1380-84.)

### B. Plaintiffs Contract to Provide Additional Services to ACH.

After ACH paid a deposit, Plaintiffs began to identify underpayments. (Pl. Ex. D, ECF No. 57-5, PAGEID # 366; Def. Mot. Ex. A, Morrow Dep. 241:18-24, PAGEID # 752.) But gaining access to all of ACH's billing systems proved difficult. (*See* Def. Mot. Ex. H, Dowling Dep. 74:5-9; 91:2-15, ECF No. 82-9, PAGEID # 1074.) Between April and September 2020, Plaintiffs repeatedly told ACH that they did not have the necessary access to all of ACH's billing data. (*See id.* 164:17-165:15, PAGEID # 1092.)

When Plaintiffs were finally able to access some of ACH's billing and payment systems, they discovered that some data was missing. (Def. Mot. Ex. A, Morrow Dep. 114:24–115:17; PAGEID # 721.) Specifically, Plaintiffs found data where ACH had billed a payor but could not find the matching receipt from the payor for that bill, so Plaintiffs could not determine if those bills were paid or not. (*Id.*) Plaintiffs recommended to ACH that it engage auditing and consulting services to improve its billing systems and practices. (*Id.* 319:15-321:6, PAGEID # 772; Def. Mot. Ex. H, Dowling Dep. 158:11-20, PAGEID # 1091.)

On October 30, 2020, Plaintiffs and ACH executed three addenda to the Service Agreement ("Addenda"), two of which are relevant to the parties' dispute. Addendum A provides that, in addition to the collection of underpayments, Plaintiffs would identify and recover lost revenue that were not underpayments

("Lost Revenue") in exchange for 35% of any such Lost Revenue collected. (Compl. Ex. A, Addendum A, ECF No. 1-1, PAGEID # 25.) Addendum B describes the scope of the Lost Revenue recovery work. (*Id.*, Addendum B, PAGEID # 26-28.) ACH paid another deposit to begin services under the Addenda. (Pl. Ex. D, ECF No. 57-5, PAGEID # 366; Def. Mot. Ex. A, Morrow Dep. 241:18-24, PAGEID # 752.)

### C. ACH Terminates Access to its Billing System.

Shortly after executing the Addenda, when Plaintiffs requested access to another of ACH's billing systems, Mr. Harper contacted ACH's third-party billing representative to provide the requested access. (Pl. Mot., Harper Dep. Vol. II, 96:1-98:13, ECF No. 57-8, PAGEID # 396-97; *see* Pl. Mot. Ex. C, ECF No. 57-4, PAGEID # 360.) But on November 25, 2020, that third-party billing representative emailed Plaintiffs, Mr. Harper, Dr. Sher, and Dr. Yun Tae Chang (an ACH Board member), stating that Dr. Sher had "put a hold on" access to ACH's billing data. (*Id.*) When Mr. Harper followed up with Drs. Sher and Chang, he learned that ACH had cut off Plaintiffs' access to its billing systems. (Pl. Mot., Harper Dep. Vol. II, 97:1-98:25; 102:21-104:6, PAGEID # 396, 398.)

Despite having been unable to gain full access to ACH's billing systems, Plaintiffs provided ACH with two reports of identified underpayments. In the first report, dated December 4, 2020, Plaintiffs identified $5.5 million in potential underpayments. (Def. Mot. Ex. H, Dowling Dep. 153:17-154:6, PAGEID # 1089-90.) The second report, dated December 9, 2020, identified $21.7 million in

underpayments and Lost Revenue, which amount included the $5.5 million from the first report. (*Id.* 171:8-23, PAGEID # 1094.)

### D. Plaintiffs Send ACH a Notice to Cure, and ACH Terminates the Service Agreement.

On December 21, 2020, Plaintiffs sent ACH a "10 Day Notice to Cure Material Breach of Agreement" and an invoice for past due deposits. (Pl. Mot. Ex. D, ECF No. 57-5, PAGEID # 365-68.) Plaintiffs claimed that ACH breached at least 20 different contractual provisions by, among other things, preventing Plaintiffs' access to all systems, resources, and personnel. (*Id.*)

Despite ACH's alleged breach, Plaintiffs continued to collect ACH's billing data and to identify additional underpayments and Lost Revenue. (Def. Mot. Ex. H, Dowling Dep. 150:21-151:2, PAGEID # 1089.) They sent an invoice to ACH for $13.8 million (60% of their total findings) on February 1, 2021. (Opp., ECF No. 65-1, PAGEID # 453-54.) Then, on February 9, 2021, Plaintiffs issued an invoice to ACH for $17.58 million, which Plaintiffs claimed was 60% of the identified underpayments. (*Id.*). (Def. Mot. Ex. A, Morrow Dep. 242:5-244:24, PAGEID # 753.)

Also on February 9, 2020, ACH sent Plaintiffs a notice of termination and cease and desist letter. (Pl. Mot. Ex. E, ECF No. 57-6, PAGEID # 372-73.) ACH stated that it was terminating the Service Agreement, Addenda, and any exhibits thereto because it no longer wanted Plaintiffs' services and did not want to pursue any underpayments. (*Id.*) It demanded that Plaintiffs immediately "cease and desist from taking any further action on behalf of ACH." (*Id.*)

Despite ACH's termination letter, until June 2021, Plaintiffs continued to access and pull data from ACH's billing system to monitor for payments on identified underpayments. (Def. Mot. Ex. A, Morrow Dep. 145:2-148:11, PAGEID # 729.)

## II.   PROCEDURAL POSTURE

Plaintiffs assert two claims against ACH: breach of contract (Count I) and seeking a declaratory judgment related to ACH's alleged breach and a declaration that they are entitled to 60% of the identified underpayments (Count II). (Compl. ¶¶ 37-56, PAGEID # 9-12). ACH asserts five counterclaims: seeking a declaratory judgment that the 60% fee provision is an unenforceable penalty (Count I), fraudulent inducement (Count II), negligent misrepresentation (Count III), and violation of the federal Computer Fraud and Abuse Act ("CFAA") (Count IV) and violation of the Florida Computer Abuse and Data Recovery Act ("CADRA") (Count V). (*See generally* First Am. Counterclaim, ECF No. 8.)

The Court denied ACH's Motion for Partial Judgment on the Pleadings (ECF No. 31) and bifurcated this matter as to liability and damages (ECF No. 77). Plaintiffs have filed a Motion for Partial Summary Judgment seeking summary judgment that ACH prevented them from recovering underpayments and a declaration regarding the interpretation of the 60% fee provision.[1] ACH has filed a

---

[1] In its response to Plaintiffs' Motion for Partial Summary Judgment, ACH requested additional discovery under Federal Rule of Civil Procedure 56(d), arguing additional discovery was necessary to resolve issues pertaining to the construction, validity, and enforceability of the Service Agreement. (Opp., ECF No. 65, PAGEID # 445.) At the time of ACH's request, more depositions had been scheduled. The

cross Motion for Partial Summary Judgment seeking judgment in its favor on both of Plaintiffs' claims and on its counterclaims for declaratory judgment, fraudulent inducement, and violation of the CFAA and CADRA.

## III. ANALYSIS

The parties' dispute centers on the interpretation and enforceability of the 60% fee provision in the Service Agreement. ACH claims, in the first instance, that it is not bound by the Service Agreement because the Agreement was procured by fraudulent inducement. Assuming that the Service Agreement is not rescinded as a result of ACH's fraudulent inducement claim, Plaintiffs argue that the 60% fee provision entitles them to a fee based on all identified underpayments. ACH urges that the 60% fee applies only to collectible underpayments and argues in the alternative that the 60% fee provision is an unenforceable penalty. The Court addresses these disputes first, before turning to ACH's CFAA and CADRA claims.

### A. ACH's Fraudulent Inducement Counterclaim (Count II)

A contract procured by fraudulent inducement may be rescinded under Ohio law.[2] *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 873 (6th Cir. 2007). "A claim for fraudulent inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation." *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574,

---

anticipated depositions have since be taken, so Plaintiffs' 56(d) request is **DENIED as MOOT**.

[2] The Court's jurisdiction is based on diversity of citizenship so it applies the substantive law of the forum state. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, *inter alia*, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1939)). Additionally, the Service Agreement contains a choice of law provision applying Ohio law. (Pl. Mot. Ex. A, § 17, ECF No. 57-2, PAGEID # 352.)

578 (Ohio 1998) (citation omitted). "A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract." *Id.*

To prove fraudulent inducement, a plaintiff must prove by clear and convincing evidence: (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) defendant's knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) defendant's intent to induce reliance on the representation; (4) plaintiff's justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance. *Micrel,* 486 F.3d at 874 (internal quotation marks and citations omitted); *Mid-Am. Tire, Inc. v. PTZ Trading Ltd.*, 768 N.E.2d 619, 628 (Ohio Ct. App. 2002). Plaintiffs argue that ACH is not entitled to summary judgment because it has not proven the first and fourth elements.

As to the first element, ACH claims that there were five misrepresentations in Plaintiffs' brochure:

1) Plaintiffs had a "dedicated team of auditors, adjustors, and attorneys specializ[ing] in recovering underpayment revenues";
2) Plaintiffs' "[c]lose, professional relationships have been developed with payors to enhance our success rate";
3) Plaintiffs' "teams" had identified $49.5 million in underpayments for two hospitals in New York;
4) Plaintiffs' "teams" had recovered "$12 million and $25 million for hospitals in Texas and Louisiana"; and
5) Plaintiffs listed five different hospital projects and four different fire department/EMS providers as "examples of successful audit and revenue recovery programs completed by our teams" under a section called "Previous Client Revenue Recovery Projects."

(Def. Mot., ECF No. 82, PAGEID # 671; *see also* Ex. E, ECF No. 82-6, PAGEID # 987-89.) ACH claims that these statements are false because Plaintiffs had never successfully identified or recovered any underpayments for a client – it argues that Plaintiffs had only helped clients identify *potential* underpayments, negotiated settlements of underpayment, and completed data analysis. (Def. Mot., ECF No. 82, PAGEID # 671-73.)

But ACH has put forward no evidence that these statements are false. The first two statements are merely Plaintiffs' own opinions touting their "dedication" and "relationships" and are not misrepresentations as a matter of law. *Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting GMBH*, No. 1:05-CV-00702, 2009 U.S. Dist. LEXIS 25201, at *32-33 (S.D. Ohio Mar. 26, 2009) (Spiegel, J.) (citation omitted) ("Statements of opinion or belief such as "puffing" cannot constitute a misrepresentation"); *see also Colley v. Scherzinger Corp.*, No. 1:15-CV-720, 2016 WL 2998111, at *4 (S.D. Ohio May 25, 2016) (Beckwith, J.) (finding that alleged misrepresentation must be one of fact and not opinion).

And the other three statements are about auditing and revenue recovery work completed by Plaintiffs' "team." ACH does not dispute that members of Plaintiffs' team worked on the referenced projects—it complains that the team members did those projects before they worked for Plaintiffs. (Def. Mot., ECF No. 82, PAGEID # 671-63.) But the statements in the brochure do not say that the team members were working for Plaintiffs when they completed the other projects – only that the "team" had done the work. In the same way that a company hires an

11

employee for his or her skills and experience, the company can tout that employee's experience.

ACH has not proven the first element of its fraudulent inducement counterclaim. Its Motion for Partial Summary Judgment on Count II is **DENIED**.

## B. Plaintiffs' Claim for Breach of Contract (Count I)

ACH seeks summary judgment on Plaintiffs' claim for breach of the Service Agreement, arguing that it neither prohibited Plaintiffs from recovering underpayments nor denied Plaintiffs access to its billing data and system; it also argues that Plaintiffs waived any alleged breach based on ACH's failure to provide access. For their part, Plaintiffs do not seek summary judgment on their breach of contract claim – instead, they ask the Court to find as a matter of law that ACH did not allow Plaintiffs to move forward with seeking to recover, or prohibited Plaintiffs' ability to recover, underpayments under the Service Agreement. (Pl. Mot., ECF No. 57, PAGEID # 328.)

Under Ohio law, "the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber,* 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). A party breaches a contract if he fails to perform according to the contract or acts in a manner that is contrary to its provisions. *See Jarupan v. Hanna,* 878 N.E.2d 66, 73. When the facts are undisputed, the determination of whether a certain act constitutes a breach of

12

contract is a question of law. *Little Eagle Properties v. Ryan*, 2004-Ohio-3830, ¶ 17 (citations omitted).

### 1.    ACH prohibited Plaintiffs from recovering underpayments.

ACH allowed Plaintiffs to submit appeals of some underpayments in August 2020. (Def. Mot. Ex. A, Morrow Dep. 202:13-205:19, ECF No. 82-1, PAGEID # 743.) But it is undisputed that ACH prevented Plaintiffs from pursuing any additional appeals of underpayments after that time. (Pl. Mot. E, ECF No. 57-6, PAGEID # 372-73.) Also, Plaintiffs sent two reports to ACH in December 2020 with their final analyses of identified underpayments, but ACH terminated the Service Agreement in February 2021– effectively stopping Plaintiffs from appealing any more underpayments. Thus, the Court finds that ACH prohibited Plaintiffs from recovering underpayments.

### 2.    ACH has not shown that it did not breach the Service Agreement.

ACH also seeks summary judgment on Plaintiffs' breach of contract claim to the extent Plaintiffs allege it failed to provide access to its billing systems and data. (Def. Mot., ECF No. 82, PAGEID # 685-86.) ACH argues that it did provide Plaintiffs access to some of its billing and data systems (otherwise, Plaintiffs would not have been able to identify underpayments at all), but a genuine dispute remains as to whether ACH substantially performed as to the access provided. Specifically, Plaintiffs have presented evidence that ACH did not provide them with all of the necessary access from the beginning of their performance, and that ACH stopped

Plaintiffs from accessing at least one of its billing systems in November or December 2020. (Pl. Mot., Harper Dep. Vol. I, 97:1-98:25, 102:21-104:6, ECF No. 57-8, PAGEID # 396-98; Pl. Mot. Ex. C, ECF No. 57-4, PAGEID # 362.)

ACH's Motion for Summary Judgment on this issue is **DENIED**.

### 3.    ACH has failed to demonstrate that Plaintiffs waived their breach of contract claim.

ACH next seeks summary judgment on Plaintiffs' breach of contract on the grounds that, even if it did deny access to some of its data, Plaintiffs waived its claim because they continued to collect data and eventually had enough data to identify underpayments. (Def. Mot., ECF No. 82, PAGEID # 685-86.)

A waiver is an intentional relinquishment of a known right, and contractual terms may be waived expressly or impliedly; a waiver by implication cannot arise contrary to the parties' intention unless the opposite party has been prejudicially misled or lulled into believing strict compliance is not required. *Globe Metallurgical, Inc. v. Hewlett-Packard Co.*, 953 F. Supp. 876, 882 (S.D. Ohio) (Kinneary, J.) (citations omitted) (applying Ohio law). The party asserting the existence of a waiver must prove the waiving party's clear, unequivocal, and decisive act to waive its rights. *CosmetiCredit, L.L.C. v. World Fin. Network Natl. Bank*, 24 N.E.3d 762, 772 (citation omitted).

ACH has not provided evidence that Plaintiffs expressly waived their right to enforce any provision of the Service Agreement, nor has it shown that it was prejudicially misled or lulled into believing that Plaintiffs would not seek to enforce any provision of the Service Agreement. In fact, Plaintiffs repeatedly informed ACH

14

that they were not getting access to the data that they needed and sent a notice to cure. *Globe Metallurgical*, 953 F. Supp. 876 at 882 (finding that the waiving party did not waive enforcement of the contract because it had informed the opposing party of the breach).

Thus, ACH has not proven that it is entitled to summary judgment on Plaintiffs' breach of contract claim and its Motion for Summary Judgment on this claim is **DENIED**.

### C. Claims for Declaratory Judgment (Claim II and Counterclaim I)

The Court now turns to the parties' claims for declaratory judgment asking what the 60% fee provision means and is it enforceable.

#### 1. Interpretation of the fee provision

Plaintiffs contend that the 60% fee provision is unambiguous – they are entitled to 60% of the total possible identified underpayments, including identified Lost Revenue. (Pl. Mot., ECF No. 57, PAGEID # 340-41.) ACH argues the 60% fee provision applies only to "legitimate" or "collectible" underpayments not including Lost Revenue. (Opp., ECF No. 65, PAGEID # 441-43.)

When interpreting a contract, the Court's purpose "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.,* 678 N.E.2d 519, 526 (Ohio 1997). Courts presume that the intent of the parties' rests within the language of the contract. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly

evidenced from the face or overall contents of the instrument." *Id.* (internal quotations omitted).

A contract will only require further analysis if the applicable language is ambiguous—that is, open to more than one reasonable interpretation. *See Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003). "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *(Id.).* An ambiguity must be apparent on the face of the contract, and extrinsic evidence is not permissible to "create an ambiguity." *(Id.)* A contract is not ambiguous merely because the parties disagree over its meaning. *Tattletale Portable Alarm Sys. v. MAF Prods.*, No. 2:14-cv-00574, 2016 WL 5122545, at *6 (S.D. Ohio Sep. 21, 2016) (Sargus, J.) (citation omitted) (applying Ohio law). "[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law).

Here, ACH agreed to pay Plaintiffs a fee if it did not allow Plaintiffs to move forward with recovery of underpayments: the fee is "60% of the total UNDERPAYMENTS identified."

"Identified" is the adjective used to describe "underpayments." Looking at its ordinary meaning, "identify" means "to ascertain the identity of (. . .something that is unfamiliar or unknown)." *Merriam-Webster Online Dictionary*,

https://www.merriam-webster.com/dictionary/identify (last visited April 24, 2024.)
"Identified" underpayments makes no provision for whether the underpayments are
"legitimate" or "collectible", only that the amounts be ascertained.

And the underpayment to be ascertained is defined in the Service Agreement
as "[t]he difference between the amount paid and the amount that should have been
paid," where  "should" (the past tense of "shall") means "has a duty to" or "required
to." SHALL, Black's Law Dictionary (11th ed. 2019). So an underpayment does have
some element of requiring legitimacy – the underpayment is calculated using the
amount that "should have been paid" not the amount that "was not paid."

Part of the dispute with regard to the definition of "underpayment" is
whether the 60% fee provision also applies to Lost Revenue. It does not. The Service
Agreement specifically defines underpayments as the difference between amounts
paid and amounts that should have been paid. When the parties learned that there
were instances in which no amount was paid, or payment data was missing so
Plaintiffs could not determine if any amount had been paid, the parties executed
Addendum A to define Lost Revenue (for which they agreed a different rate of pay
for collections). Thus, Lost Revenue was something not originally covered by the
Service Agreement – otherwise, there would have been no need to execute
Addendum A. *See Lockheed Martin Corp. v. Goodyear Tire & Rubber Co.*, No. 5:10
CV 673, 2012 WL 3499510, at *6 (N.D. Ohio Aug. 15, 2012), *aff'd*, 529 F. App'x 700
(6th Cir. 2013) ("Ohio contract law requires the Court to interpret the contract as a
whole and so as not to render clauses superfluous, and to harmonize all provisions

17

of a contract.") Thus, reading the Service Agreement as a whole, Lost Revenue is different from an underpayment.

The 60% fee provision is unambiguous; it can reasonably be interpreted only to mean that Plaintiffs are entitled to 60% of identified underpayments, which does not to include Lost Revenue.

### 2.    Whether the fee provision is an unenforceable penalty

Now that we know what the 60% fee provision means, is it enforceable?

Although parties are generally free to enter into contracts with liquidated damage provisions, "complete freedom of contract is not permitted for public policy reasons." *Lake Ridge Academy v. Carney,* 613 N.E.2d 183, 187 (Ohio 1993). Liquidated damages are damages that the parties to a contract agree upon, or stipulate to, as the actual damages that will result from a future breach of the contract. *Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 507 (Ohio 2016) (citation omitted). The purpose of a liquidated damages clause is to compensate the nonbreaching party for actual damages resulting from breach of the contract and thereby prevent a controversy as to the damages amount. *See id.* (internal quotations omitted). Any recovery must be for that amount; "[n]o larger or smaller sum can be awarded even though the actual loss may be greater or less." *Id.* (internal quotations omitted).

However, a liquidated damages provision is unenforceable when it creates a penalty. "Penalty provisions in contracts are invalid on public policy grounds because a penalty attempts to coerce compliance with the contract rather than represent damages which may actually result from the failure to perform." *Heskett*

18

*Ins. Agency, Inc. v. Braunlin,* No. 11CA3234, 2011 WL 5903484, at *6 (Ohio Ct. App. Nov. 16, 2011). The party seeking to invalidate a liquidated damages provision bears the burden of proof that the clause is unenforceable, and the determination of whether a liquidated damages provision is an unenforceable penalty is a matter of law to be determined by the Court. *CosmetiCredit,* 24 N.E.3d at 776; *Easton Telecom Servs., L.L.C. v. CoreComm Internet Grp., Inc.*, 216 F. Supp. 2d 695, 699 (N.D. Ohio 2002).

Ohio courts apply a three-part analysis, the *Samson* test, to distinguish between an improper penalty and a liquidated damage provision:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amounts so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Kurtz v. W. Prop., L.L.C.,* No. 10AP–1099, 2011 WL 6916196, at *6 (Ohio Ct. App. Dec. 27, 2011) (quoting *Samson Sales, Inc. v. Honeywell, Inc.,* 465 N.E.2d 392, 394 (Ohio 1984)). For a contract provision to be construed as a liquidated damages clause, and not a penalty, all three conditions must be met. *Id.* Liquidated damages provisions that impose amounts that are "manifestly inequitable and unrealistic" are unenforceable penalties. *Samson*, 465 N.E.2d at 392.

19

Plaintiffs argue that the 60% fee provision meets all three requirements of the *Samson* test. But ACH has established that the second *Samson* requirement is not met here, so the Court need not address the other two.

If Plaintiffs had proceeded with the appeals and collection process, they would have been paid 50% of every collected underpayment. Payment on all identified underpayments is not guaranteed; according to Plaintiffs, they typically recover only 65% to 90% of identified underpayments. (Def. Mot. Ex. E, ECF No. 82-6, PAGEID # 987.) Even on collected underpayments, the Service Agreement allows Plaintiffs to negotiate with a third-party payor and reduce the amount collected to 75% of the amount identified. (Pl. Mot. Ex. A, Schedule A, PAGEID # 354-56.) Also, Plaintiffs identified underpayments for the previous two years, even though they recognize that "most" third-party payors require appeals to be filed within one year. (*See* Def. Mot. Ex. A, Morrow Dep. 71:21-72:12, PAGEID # 710.)

The disputed fee provision provides that Plaintiffs will receive 60% of ***all*** "identified" underpayments and it bears no reasonable correlation to Plaintiffs' actual damages as a result of any breach or termination of the Service Agreement. *See Easton,* 216 F. Supp. 2d at 698; *see also Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 933 F. Supp. 2d 974, 998 (S.D. Ohio 2013) (Sargus, J.) (finding that the purported liquidated damages provision was an unenforceable penalty because it was not a reasonable estimate of the defendant's damages). In fact, Plaintiffs' estimate their actual damages to be approximately $1.3 million, yet they seek to collect $17.58 million based on the 60% fee provision—a grossly

20

disproportionate amount.[3] (Def. Mot. Ex. A, Morrow Dep. 216:3-220:6, ECF No. 82-1, ECF No. 747.) The 60% fee provision unreasonably penalizes ACH for breach or termination of the Service Agreement.

Accordingly, Plaintiffs' Motion for Partial Summary Judgment as to their declaratory judgment claim (Count II) is **DENIED**. ACH's Motion for Partial Summary Judgment is **GRANTED**. The 60% fee provision is unenforceable.

### D.     Federal and State Computer Abuse Counterclaims

ACH alleges that Plaintiffs violated CFAA (Count IV) and CADRA (Count V) when they continued to access billing data and records after ACH terminated the Service Agreement. (First Am. Countercl. ¶ 43-59, ECF No. 8, PAGEID # 91-94; Def. Mot., ECF No. 82, PAGEID # 686-89.)

#### 1.     CFAA (Count IV)

CFAA prohibits certain conduct involving unauthorized access to computers. *See* 18 U.S.C. § 1030(a)(1)-(a)(7). While primarily a criminal statute, it permits "[a]ny person who suffers damage or loss by reason of a violation of this section [to]

---

[3] Plaintiffs offer two decisions from Ohio courts that they claim support enforcement of the 60% fee provision here. Both cases are distinguishable. In *Kraft*, the court found that the defendant had waived its legal defenses in the disputed settlement agreement and offered no evidence that the provision was a penalty. *Kraft Elec. Contracting, Inc. v. Lori A. Daniels Irrevocable Tr. Dated Jan. 15, 2001*, 136 N.E.3d 951, 958 (Ohio 2019). And in *O'Brien*, the court found that the liquidated damages provision in the plaintiff's employment contract was not unreasonable nor disproportionate because the formula accounted for his remaining base salary, benefits, supplemental compensation, and collateral income he would have earned if he had not been fired. *O'Brien v. Ohio State Univ.*, 859 N.E.2d 607, 615-618 (Ohio 2006).

maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g).

To recover under the CFAA, ACH must prove that: (1) Plaintiffs intentionally accessed a computer; (2) the access was unauthorized or exceeded Plaintiffs' authorized access; (3) through that access, Plaintiffs' obtained information from a protected computer; and (4) the conduct caused loss to one or more persons during any one-year period aggregating at least $5,000 in value. *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 759 (6th Cir. 2020). A "protected computer," includes any computer "used in affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Plaintiffs dispute the first and fourth elements, but the Court need not evaluate the first element because ACH has not shown that there is no genuine issue of material fact as to the fourth. Specifically, ACH has not provided evidence that Plaintiffs' access caused any loss to it or to any other person. Because this is a necessary element of its claim, it is not entitled to summary judgment.

### 2. CADRA (Count V)

CADRA[4] was enacted "to safeguard computer systems against unauthorized access." *Kipu Sys. LLC v. Zencharts LLC*, No. 17-cv-24733, 2019 WL 7371879, at *7 (S.D. Fla. Oct. 16, 2019) (citing Fla. Stat. § 688.801). A plaintiff must establish that the defendant "knowingly and with intent to cause harm or loss…obtains

---

[4] Even though Ohio law applies to the claims involving the Service Agreement, ACH can bring a claim under Florida law because it is a Florida-based hospitalist practice and the alleged harm caused by the unauthorized access occurred in Florida.

information from a protected computer without authorization and, as a result, causes harm or loss." Access "without authorization" includes any access by a person who is not an "authorized user." *Id.* § 668.802(9)(a).

ACH has failed to provide evidence that Plaintiffs accessed ACH's billing system with the requisite intent to cause harm or loss. Thus, summary judgment in its favor is not warranted.

ACH's Motion for Partial Summary Judgment on its counterclaims for violations of CFAA (Count IV) and CADRA (Count V)  is **DENIED**.

## IV.     CONCLUSION

ACH's Motion to Strike (ECF No. 89) is **DENIED as MOOT**. ACH's Motion seeking to exceed the 10-page limit is **GRANTED**. (ECF No. 87.)

Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** (ECF No. 57) and ACH's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** (ECF No. 82) as follows:

- To the extent that Plaintiffs sought summary judgment that ACH prohibited Plaintiffs from collecting identified underpayments, their Motion is **GRANTED**.

- To the extent ACH sought summary judgment on Plaintiffs' breach of contract claim (Count I), ACH's Motion is **DENIED**.

- To the extent that the parties sought summary judgment on their declaratory judgment claims regarding the enforceability of the 60% fee provision, Plaintiffs' Motion is **DENIED** and ACH's Motion is **GRANTED**. The 60% fee provision is unenforceable.

- ACH's Motion for Partial Summary Judgment on its fraudulent inducement counterclaim (Count II), CFAA counterclaim (Count IV), and CADRA counterclaim (Count V) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

24